UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**GROSSE ILE BRIDGE COMPANY,**

    Plaintiff,

v.                                                                                    Case No. 92-CV-76556-DT

**AMERICAN STEAMSHIP COMPANY,**                           HONORABLE DENISE PAGE HOOD

    Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON REMAND**

**I.     INTRODUCTION**

    This case was tried before this Court resulting in a judgment in favor of American Steamship Company and against the Grosse Ile Bridge Company.  This Court found no liability on the part of the vessel, the M/V H. Lee White or its captain.  On appeal, the Sixth Circuit Court of Appeals affirmed this Court's decision except on the issue of the negligence of the M/V H. Lee White in failing to more timely drop its port bow anchor when attempting to stop the vessel in the waters of the Detroit River as the vessel approached the Grosse Ile Toll Bridge on September 6, 1992.  *Grosse Ile Bridge Co. v. American Steamship Co.,* 302 F.3d 616, 626 (6th Cir. 2002).

    The facts surrounding the allision of the M/V White and the Grosse Ile Toll Bridge are set forth in detail in this Court's decision of October 31, 2000 and also in the Sixth Circuit's opinion of September 9, 2002.  In short, on September 6, 1992, the Grosse Ile Toll Bridge failed, without explanation, to timely swing open despite repeated requests and signals of danger, and

the Bridge's own assurances and notification that it would be open for the vessel to pass through safely. The vessel allided with the bridge and the stationary span of the bridge was knocked off the pedestal into the water resulting in damage to the bridge and lost revenues from bridge tolls.

The standard of review directs the circuit court to review the district court's apportionment of fault using the clearly erroneous standard. *In re Cleveland Tankers, Inc.*, 67 F.3d 1200, 1205 (6th Cir. 1995). The Sixth Circuit noted, "a finding is clearly erroneous where, although there is evidence to support that finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 274 F.3d 1043, 1047 (6th Cir. 2001).

## II.  APPORTIONMENT

The Sixth Circuit Court of Appeals reversed and remanded the matter for this Court to apportion fault for the vessel's negligent delay in dropping the port bow anchor when attempting to "stop the ship short of the bridge." *Grosse Ile Bridge*, 302 F.3d at 626. The Sixth Circuit wrote that the explanation given by Captain Gapczynski, that the vessel could not pass through the "draw dragging an anchor," was inconsistent with the Captain's "strategic decision to stop short of the bridge." *Id.* at 625. The Circuit Court also found that the delay constituted negligence "even under the *in extremis* doctrine." *Id.* at 626. Under the *in extremis* doctrine, a lower standard of reasonableness is applied in a crisis situation, a situation usually of sudden peril not the fault of the vessel. *Union Oil Co. of California v. The Tug Mary Malloy*, 414 F.2d 669, 673-74 (5th Cir. 1969). The appellate court found that the *in extremis* doctrine was applicable in this case. The court reasoned that once the Captain decided to stop the ship it was unreasonable to delay dropping the port bow anchor. *Grosse Ile Bridge,* 302 F.3d at 626. The court found that the vessel traveled 1700 feet before dropping the port bow anchor, "one of the

most obvious and effective steps" that could have been taken. *Id.* The court also noted that the distance traveled gave the Captain four minutes to consider the steps required to stop the ship. *Id.*

The finding of this Court, having reviewed the parties' supplemental briefs, testimony and exhibits presented at trial, is that the fault should be apportioned 97% against the Grosse Ile Bridge Company and 3% against the American Steamship Company.

The parties agree the rule of *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397 (1975) governs the apportionment of fault in this case. "We hold that when two or more parties have contributed by their fault to cause property damages in a maritime collision or stranding, liability for such damages is to be allocated among the parties proportionately to the comparative degree of the fault." *Id.* at 411. The Court agrees with Grosse Ile Bridge's assertion that apportionment is "not a mechanical exercise that simply counts up the errors of both parties." (Grosse Ile Bridge's Br. at 5) The Court will look to the "quality of the faults" and the weight or significance of the fault in causing the casualty. *Id.* (citing Schoenbaum, *Admiralty and Maritime Law,* 14-4 at p. 303 (3d ed. 2002)). The case law on apportionment in cases like this supports a "fact specific" finding as noted by Grosse Ile Bridge. Both parties have cited cases where the facts have driven the decision on apportionment, although no set of facts is particularly similar to the facts of this case.

The Court begins by noting that at the trial of this matter, this Court found no fault as to the American Steamship Company. The reviewing court notes that this Court found that the bridgetenders were competent in their ability but did not exercise competence on the date in question. The Court renews its finding that the bridgetenders did not perform in a competent manner on the date of the allision. The Court of Appeals wrote, "[w]hy the bridge failed to

timely open is less than clear." *Grosse Ile Bridge,* 302 F.3d at 620.  However, this Court finds it clear that the bridge failed to open timely because the bridgetenders utterly failed to perform their duties in a competent manner on the day in question. The bridgetenders just did not open the bridge or do any of the things necessary to ensure the bridge would open in time. Although the bridgetenders had given every prior assurance (within a twenty-four hour period of time) to the vessel that the bridge would open, at the time the vessel was within minutes of passing through the bridgetenders continued to allow cars to drive onto the bridge, thereby placing the vessel's captain in the position of making split decisions about whether to stop or to attempt to stay in line to proceed (even while backing the vessel) in the event the bridge opened.

Bridgetender John Tonkovich testified that he simply thought he had more time to open the bridge than he did, and that he did not hear the ship's second danger signal. The bridgetenders heard none of the vessel's signals nor the tug's blasts even though these blasts had drawn the attention of numerous bystanders on the shores and boaters.  Dan Ryan, the toll taker on the bridge, offered no justification why the bridge was not opened timely.  It was clear at the trial of this matter that the bridgetenders had absolutely no reason for not opening the bridge in a timely manner. They had ample notice up to 24 hours ahead that the vessel would require the bridge to open. They acknowledged all the earlier requests for the bridge to open by indicating the bridge would open. They gave no reason for not responding to the danger blasts from the ship or the tug by radio or in any other fashion.  They had given the signal that the bridge would be open, but continued to allow cars upon the bridge.  The bridgetender responsible for opening the bridge could only suggest he did not give himself enough time to open the bridge.  In the face of the bridgetenders' failure to act with 24-hours' notice, thereby creating an emergency situation, the bridge company argues that the vessel's captain's unreasonable delay of four to

eight minutes to drop his port bow anchor was fatal. (Grosse Ile Bridge's Br. at 6) What was fatal was the bridgetenders' failure to respond timely and to honor the request of the vessel to open and the commitment of the bridge to open timely. The bridgetenders' actions endangered the vessel and the crew, causing the resulting massive damage to the bridge.

Under maritime law, the vessel has the right of way and the bridge should have been opened long before the vessel began to signal danger by blowing its whistles and certainly before the vessel began its attempt to stop. *Clement v. Metropolitan West Side El. Railway Co.,* 123 F. 271, 273 (7th Cir. 1903). The Grosse Ile Bridge Company and these bridgetenders are significantly and predominately at fault for the damages in this case and unlike the Captain of the M/V White, they were not required to make the critical decisions made within minutes, even four minutes, that the Captain of the M/V White was destined to make on that fateful day. American Steamship correctly observes that "this Court has been asked to consider the relative degrees of fault between a party that has been determined to have created an emergency situation, and a party that, having been placed in that emergency situation through no fault of its own, was forced to respond to it in the 'heat of the moment'." (American Steamship Br. at 4)

Having determined that the bridgetenders are predominantly at fault, this Court reviewed the testimony regarding the dropping of the port bow anchor. The Court in this review attempted to determine if the evidence showed whether and if so, at what point the dropping of the port bow anchor could have prevented the allision. The Court also endeavored to determine whether the evidence showed that there was clear fault on the part of the Captain of the M/V White in his "inconsistent decision" to back the vessel while still attempting to stand in line with the draw in order to pass through the draw if the bridge began to open.

The testimony of James Murnane, American Steamship's expert, a captain, indicated that as a captain he would like the bridge to open before vessel approached the buoys, but that the bridge seldom opens at that point. When asked what he looks for, Captain Murnane, like Captain Gapczynski, looks for activity on the bridge despite any signal that the bridge is opening, once again calling into question the bridgetenders' competency and fault on the day in question. The Court finds that such reliance on a view of the activity on the bridge supports Captain Gapczynski's decision to begin backing but not to lower the port bow anchor in order to stop.

The Captain of the M/V White was commanding a crew of men preparing to pass through a swing drawbridge over which cars routinely traveled. He had posted a lookout. He had the vessel's anchors at the ready. He was monitoring the vessel's speed. He was looking for the buoys. He had signaled the bridge and had blown danger blasts as had the tug attached to the vessel. Once his lookout indicated the cars had cleared, he was prepared to pass through the draw. Then his lookout indicated that additional cars had been allowed on the bridge. Believing the bridge might not open, he began to back the vessel notifying the tugs to assist him. At this point the Captain must make a number of decisions. Does he want to have the vessel fall into a position from which it cannot easily recover enough to pass through the draw if the bridge opens? Will it be safe to pass over the anchor or to drop it? How will dropping each anchor impact the ability of the vessel to maneuver? How are the tugs fairing and will they be impacted by the dropping of any anchor? There are other questions that have been raised in this case that the Captain considered and rejected or did not consider. All of these decisions had to be made within minutes. Once the additional vehicles were allowed on the bridge every action or inaction the Captain took was because of the precarious position in which the bridgetenders had placed the vessel. The decision to drop and the timing of the decision to drop the port bow

anchor was only one, though an important one, of many split-second decisions to be made on that day. Again, while some fault must be attributed to the vessel, that fault pales in comparison to the fault of the bridgetenders to execute the few decisions required of the bridgetenders to open the bridge.

As American Steamship notes, the Court of Appeals found that the Captain had about four minutes and 1500 feet in which he should have decided to drop the port bow anchor and that his failure to do so "contributed to the casualty," even under the *in extremis* doctrine. *Grosse Ile Bridge,* 302 F.3d at 325-26. The Court of Appeals determined that the port bow anchor was dropped somewhere between 200 and 300 feet from the bridge. *Id.* at 325. The Captain testified that he did not drop the port bow anchor sooner because he was attempting to keep some alignment in case the bridge opened. The Court of Appeals found that the decision to stop the vessel and to maintain some alignment to go through the draw were contradictory in light of the Captain's knowledge that the vessel was already veering ("sheering") to port. *Id.* No mention is made by the Court of Appeals of the many decisions the Captain was making during this time nor of the Captain's past experience with dropping the port bow anchor (the Captain testified that he had backed over such a chain the year before). The Captain was also aware that by running over this anchor a hole could be punched in the bottom of the vessel again causing the Captain to consider how such an action might jeopardize human life.

In an *in extremis* situation the actions of the vessel are to be judged "leniently." *Id.* at 625. The Court's attention is also directed to *Reliable Transfer*, *supra,* where the Supreme Court wrote, "[w]e hold that when two or more parties have contributed by their fault to cause property damages in a maritime collision or stranding, liability for such damages is to be allocated among the parties proportionally to the comparative degree of their fault." 421 U.S. at 411; *see also*

*Kinsman Marine Transit Co. v. The Great Lakes Towing Co.*, 532 F.2d 1073, 1074 (6th Cir. 1976).

There are no reported cases directly on point nor any cases with facts where the primary party at fault acted with such disregard of the potential danger to persons, the vessel and the bridge. The cases cited by the parties apportion fault up to sixty percent against the vessel, which the Court discusses below.

In *Hal Antillen N.V. v. M/S Mount Ymitos*, 1998 WL 914256 (E.D. La. Dec. 29, 1998) (unpublished), the court found 10% fault on the part of the vessel for the vessel's failure to use its radar. However, this was not a case involving a vessel and a bridge.

In *Florida East Coast Railway Co. v. Revilo Corp.*, 637 F.2d 1060 (5th Cir. 1981), the court apportioned 20% fault to the vessel and 80% to the drawbridge where the bridge neglected to open the draw promptly upon signal in a non-emergency situation. In *Florida East*, the vessel maintained a circling holding pattern when the bridge did not promptly open, but when passing through the draw the vessel struck the bridge. There was no *in extremis* situation; the vessel was merely not in control on its pass through the bridge draw. However, the vessel had stopped to contact the bridge two times before attempting to navigate the draw.

A court also apportioned 20% fault against a vessel when the bridge failed to promptly open in *Magnolia Towing Co., Inc. v. Atchison, Topeka & Santa Fe Railway Co.*, 764 F.2d 1134 (5th Cir. 1985). The facts in that case show much more fault on the part of the vessel than the case at bar. In *Magnolia*, a tug was pushing two barges loaded with flammable material. It was foggy and the tug was navigating by radar. The tug, however, had no lookout, sounded no fog signal and did not signal for the bridge to open. However, like the case at bar, the bridgetender had radioed the tug captain that the bridge would be open, but the bridgetender did not open the


bridge. Although the tug captain put his vessel full astern, one of the barges hit the bridge, ignited and caused a fire that damaged the bridge, the barge and its cargo. Upon appeal in that case, the Fifth Circuit reversed the district court's opinion and found the vessel was not at all at fault, apportioning 100% fault to the bridge.

*Complaint of American Export Lines, Inc.*, 620 F. Supp. 490 (S.D. N.Y. 1985) involved the collision of a moored vessel and a moving vessel. The moving vessel lost steering ability and at "substantially full speed" plowed into an anchored tanker. It was determined that the captain in that action failed to take any action to prevent the collision. The vessel waited four minutes before reversing its engines, the auxiliary wheel was not manned and the anchors were not dropped. The vessel was found to be 60% at fault. *American Export Lines*, 620 F. Supp. at 501.

*The Virginia*, 25 F.2d 623 (2d Cir. 1928) involved the collision of two vessels. One vessel was traveling at excessive speed and had posted no crew member to man the appropriate anchor. This vessel blew its signal to the other boat. That captain decided to alter his course causing his vessel to swing across the bow of the speeding vessel. The vessels were in a narrow river. The speeding vessel then dropped the wrong anchor which caused that vessel to sheer toward another moored vessel which it struck. Fault was attributed equally between the vessels underway.

In *S.C. Loveland Inc. v. East West Towing, Inc.*, 608 F.2d 160 (5th Cir. 1979), a barge collided with a stationary bridge. The barge had been anchored near the bridge and left unattended. During two days of thunderstorms, the barge drifted until it finally hit the bridge. Bridge employees during this time did not seek assistance or attempt to contact the owner of the barge or even a towing service to secure the drifting barge. However, the employees did contact

the Coast Guard. The barge and the bridge were both found at fault. The bridge was charged 25% at fault. *S.C. Loveland* did not involve an *in extremis* situation nor a captain with numerous decisions to make that involved both the safety of the crew, the vessel, the bridge and potentially auto drivers on a bridge.  These facts are not like those of the case at bar where the fault of one party is clearly greater and where a moving bridge is involved, a bridge having responsibility to open for a vessel with the right of way.

*Southern Pacific Transportation Co. v.  The Tug Captain Vick*, 443 F. Supp. 722 (E.D. La. 1977) did involve a draw bridge and two tugboats.  In *Southern Pacific,* the vessels and the bridge all contributed substantially to the catastrophic situation. The tugs were on opposite sides of the drawbridge in waters the Coast Guard had determined were swift current conditions.  The bridge and the two tugs did not appropriately communicate with one another.  In addition, the one vessel misrepresented its position. The other vessel was in violation of Coast Guard regulations by pushing three barges. The bridge failed to accurately respond to the vessels' questions about their positions.  The fault apportioned was 50% to one of the tugs for failure to maintain control or to stop the tow; 25% to the other tug for failure to maintain radio contact; and 25% to the bridge for failing to co-ordinate safe navigation.

Grosse Ile Bridge argues that these cases involve improper use of anchors or unreasonable delays in utilizing the anchors and that the apportionment of fault was 60% and 50% to the vessels in these cases. But, neither in *Southern Pacific*, nor in fact in any of the cases cited by Grosse Ile Bridge was any one party found to be as substantially at fault as Grosse Ile Bridge is in this case. The Grosse Ile Bridge bridgetenders created this emergency situation. The vessel, up until 1700 feet, four minutes before the allision, had done everything it was required to do and more.  Even people in houses abutting the river could see that the bridge was not

opening in time. The bridge was required to open and had indicated consistently during the prior 24 hours that it would open. The Captain of the vessel had relied on this. *Southern Pacific* does not present a similar set of circumstances.

American Steamship points to a number of cases involving allision of vessels and drawbridges where the bridges were found 100 % at fault including: *Pennsylvania R. Co. v. S.S. Marie Leonhardt*, 202 F. Supp. 368 (E.D. Pa. 1962), *aff'd* 320 F.2d 262 (3d Cir. 1963) (vessel loaded with iron ore approaching rotary drawspan bridge radioed approach to the bridge, bridge responded it was opening, upon approach the vessel signaled but received no signal in return, vessel continued on based on previous signal, about 300 feet from the bridge the starboard bow anchor was dropped, and engines placed astern, the bridge then began to open, the vessel was "cocked" and hit a portion of the bridge); *Spivey Marine and Harbor Service Co. v. State of Illinois*, 46 Ill. Ct. Cl. 41, 1994 WL 855065 (1994) (bridgetender negligent); *Pilot River Transportation, Inc. v. Chicago and North Western Transportation Co.*, 912 F.2d 967 (8th Cir. 1990) (vessel with three tugs was approaching a swing bridge, vessel contacted the bridge and was told the bridge was open, yet when vessel approached minutes later the bridge was closing and the bridge notified the vessel that it was permitting maintenance workers to come on the bridge, captain reversed engines, but lost position in the river and struck the bridge); *State of Connecticut v. Tug Cynthia Moran,* 607 F. Supp. 24 (1984) (tug towing barge radioed it would arrive at the bridge in one hour; bridge confirmed it would be open; upon sighting the bridge, the tug could see it was not open; when tug contacted the bridge, the bridge said it was awaiting permission to open; captain of tug stopped engines which caused flotilla to drift five minutes; then captain put engines full astern which caused the barge it was towing to veer right, ultimately striking a portion of the bridge); *United States v. Sabine Towing and Transportation Co.*, 289 F.

Supp. 250 (E.D. La. 1968) (tug signaled bridge; no signal returned; two miles from bridge tug put engine full astern; tug went astern to port, the tow swung to starboard; tug could not steer and was carried by the current; when the bridge opened the tug was out of alignment and could not go through, ultimately striking the bridge); *San Francisco Bay Toll-Bridge Co. v. Leslie California Salt Co.*, 134 Cal. App. 237, 25 P.2d 268 (1933) (vessel gave two signals for bridge to open and bridge did not respond, vessel stopped its engines and gave third signal to which bridge said it would open but vessel captain did not think the span would open in time, captain reversed engines causing the vessel to turn and collide with the bridge); and *Pennsylvania R. Co. v. Central R. Co. of New Jersey,* 59 F. 190 (S.D. N.Y. 1892), *aff'd* 59 F. 192 (2d Cir. 1893). Although these cases were argued on appeal, the Court of Appeals was not swayed and found this Court must apportion some fault to the Captain of the M/V White.

As noted before, Grosse Ile Bridge argues that more fault should be found against the vessel because the Captain delayed four, or as they claim, eight minutes, in failing to drop the port bow anchor. Grosse Ile Bridge claims this was "fatal" and "bespeaks panic," using such language as "inexcusable" in the face of its own bridgetenders' blatant disregard of 24 hours' notice that this vessel was approaching and their confirmation that they would open the bridge.

Grosse Ile Bridge also argues the "last clear chance doctrine" requires that the vessel bear more responsibility for fault than the bridge. However, the Court finds the last clear chance doctrine is no longer applicable after the Supreme Court's decision in *Reliable Transfer Co.*, *supra.* Again, the Court notes that the fatality of this situation began when the bridgetenders failed to open the bridge timely. The Court finds the Captain of the M/V White was faced with numerous decisions effecting crew and vessel and bridge not facing the bridgetenders, and that he made a number of important decisions that protected life and reduced potential damage to

property. The failure to drop the port bow anchor pales in comparison to the fault of the bridgetenders. The Court finds those cases apportioning 100% fault against the bridge most analogous to this situation, but because of the Court of Appeals direction finds that only 3% fault should be attributed to the vessel.

### III. DAMAGES

Grosse Ile Bridge's total damage claim is $1,713,197.00, of which $983,480.50 was stipulated at trial. American Steamship did not respond to Grosse Ile Bridge's total damage claim argument on remand.

The Court finds Grosse Ile Bridge's total damage claim, specifically, the amount not stipulated by the parties, in the amount of $729,716.50, is supported by the record. Grosse Ile Bridge has properly supported its claim of: 1) loss of toll revenue in the amount of $455,897.00 (*see,* Ex. 1D); 2) North Protection Pier repair damage in the amount of $228,120 (*see,* Ex. 1C; Smoke Testimony (Tr. 11/28/95, pp. 94-95); Burt Testimony (Tr. 12/6/95, pp. 102-103, 126-144; Tr. 12/7/95, pp. 15-16)); 3) Span Replacement Expenses in the amount of $39,269.44 (*see,* Ex. 1B; Smoke Testimony (Tr. 11/28/95, pp. 28-34)); and 4) Miscellaneous Expenses in the amount of $6,430.12 (*see,* Ex. 1E; Smoke Testimony (Tr. 11/28/95, pp. 90-93)). It is noted that the total of these four items is $729,716.**56**, which is six cents over the balance of $729,716.**50** ($1,713,197.00 (Grosse Ile Bridge's total damage claim) – $983,480.50 (stipulated amount of damages) = $729,716.50).

The Court, having found Grosse Ile Bridge to be 97% at fault, reduces the amount of the total damages requested by 97% from $1,713,197.00 to $51,396.00. Prejudgment interest on a monetary award for an admiralty tort is calculated from the allision date to the judgment date. *See City of Milwaukee v. Cement Division, Nat'l Gypsum Co.,* 515 U.S. 189, 195, 115 S.Ct.

13

2091, 132 L.Ed.2d 148 (1995). Prejudgment interest is to be calculated at the prime rate, compounded annually, because that calculation of prejudgment interest fully compensates the injured party. *See Cement Div., Nat'l Gypsum Co. v. City of Milwaukee,* 144 F.3d 1111, 1115 (7th Cir.1998).

**IV.   CONCLUSION**

For the reasons set forth above,

IT IS ORDERED that fault is apportioned at ninety-seven percent (97%) by Grosse Ile Bridge and three percent (3%) by American Steamship. Damages are awarded to Grosse Ile Bridge in the amount of $51,396.00, in addition to pre-judgment interest at the applicable prime rate, compounded annually, from the allision date to the judgment date.

 /s/ DENISE PAGE HOOD  
DENISE PAGE HOOD  
United States District Judge

DATED: March 15, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 15, 2006, by electronic and/or ordinary mail.

s/William F. Lewis  
Case Manager